# WARD v. ESTALEIRO ITAJI, ET AL

# MEGHAN W. CASSIDY

December 6, 2007

*Prepared for you by*



**Bingham Farms** | Ann Arbor | Detroit | Flint | Grand Rapids | Jackson | Lansing | Mt. Clemens

PHONE:  248.644.8888   FAX:  248.644.1120

www.bienenstock.com

MEGHAN W. CASSIDY
December 6, 2007

---

**Page 1**

1          UNITED STATES DISTRICT COURT
2          SOUTHERN DISTRICT OF FLORIDA
3
4  JACKIE WARD, an individual,
5        Plaintiff,
6   vs.         Case No.05-61821-CIV
7             Hon. William J. Zloch
8  ESTALEIRO ITAJI S/A
9  METALNAVE COMPANY, a Brazilian
10  company, FRANCISCO WLASEK, an
11  individual, and PAULO ROLIM,
12  an individual,
13        Defendants.
14  _____
15
16
17     The Videotaped Deposition of MEGHAN W. CASSIDY,
18     Taken at 400 Galleria Officentre, Suite 444,
19     Southfield, Michigan,
20     Commencing at 10:01 a.m.,
21     Thursday, December 6, 2007,
22     Before Lezlie A. Setchell, CSR-2404, RPR, CRR.
23
24
25

---

**Page 2**

1  APPEARANCES:
2
3  ANDREW W. MYCHALOWYCH
4  Siciliano, Mychalowych, Van Dusen and Feul, P.L.L.C.
5  37000 Grand River Avenue
6  Suite 350
7  Farmington Hills, Michigan  48335
8  (248) 442-0510
9    Appearing on behalf of the Plaintiff.
10
11  THOMAS MEEKS
12  MATTHEW T. DAVIDSON
13  Zuckerman Spaeder, L.L.P.
14  201 South Biscayne Boulevard
15  Suite 900
16  Miami, Florida  33131
17  (305) 358-5000
18    Appearing on behalf of the Defendants.
19
20  ALSO PRESENT:
21  Thomas Schultz - Special Master (via telephone)
22  Joseph Evans - Video Technician
23
24
25

---

**Page 3**

1  Southfield, Michigan
2  Thursday, December 6, 2007
3  10:01 a.m.
4      VIDEO TECHNICIAN:  We are now on the
5  record.  This is the videotaped deposition of Meghan
6  Cassidy being taken on Thursday, December 6, 2007.
7  The time is now 10:01 and 10 seconds a.m.  We are
8  located at 400 Galleria Officentre in Southfield,
9  Michigan.  We are here in the matter of Jackie Ward
10  versus Estaleiro Itaji, a Metalnave company, et al.
11  This is Case Number 05-61821-CIV.  This matter is
12  being held before the Honorable William J. Zloch in
13  the United States District Court in the Southern
14  District of Florida.
15      My name is Joe Evans, video technician.
16  Will the court reporter swear in the witness and the
17  attorneys briefly identify themselves for the record,
18  please.
19      MR. MEEKS:  Tom Meeks for Estaleiro Itaji,
20  and with me is Matthew Davidson.
21      MR. MYCHALOWYCH:  Andrew Mychalowych
22  appearing on behalf of the plaintiff.
23      MEGHAN W. CASSIDY,
24  was thereupon called as a witness herein, and after
25  having first been duly sworn to testify to the truth,

---

**Page 4**

1  the whole truth and nothing but the truth, was
2  examined and testified as follows:
3
4         EXAMINATION
5  BY MR. MEEKS:
6  Q.  Would you state your name, please?
7  **A.  Meghan Cassidy.**
8  Q.  Ms. Cassidy, you're a lawyer; am I right?
9  **A.  Correct.**
10  Q.  How long have you been a lawyer?
11  **A.  Eight years.**
12  Q.  Do you have any special training in maritime law?
13  **A.  I took admiralty and maritime law in law school but**
14  **beyond that, no.**
15  Q.  Do you have a maritime law practice?
16  **A.  No.**
17  Q.  Do you belong to any maritime law associations or
18  societies?
19  **A.  No.**
20  Q.  Prior to the dealings between Jackie Ward and my
21  client, Estaleiro Itaji, did you have any experience
22  with the international construction -- construction of
23  new vessels outside the United States?
24  **A.  No.**
25  Q.  I want to ask you to turn to Exhibit 45, it's around

---

MEGHAN W. CASSIDY
December 6, 2007

Page 5

1    the middle of that stack.
2  A.  Okay.
3  Q.  This is something that Jackie Ward sent to Mr. Wlasek
4      in September, 2003, correct?
5  A.  I presume so based on a review of the document.
6  Q.  Well, you got a copy of it at the time, didn't you?
7  A.  It appears -- I mean, I'm copied on it, yes.
8  Q.  You don't have an independent recollection of the
9      document?
10 A.  Outside of --
11 Q.  Outside of looking at it right now?
12 A.  Or doing discovery in this litigation, no, I do not.
13 Q.  Okay.  How about the attached letter of intent; can
14     you tell me who drafted that?
15 A.  No, I cannot.
16 Q.  Was it drafted by someone in your office do you
17     believe?
18 A.  Not to my knowledge.
19 Q.  Was it drafted by someone in Ms. Ward's office?
20 A.  I do not know.
21 Q.  There's a section on the second page of the letter of
22     intent, which is the third page of the exhibit, it's a
23     paragraph with the letter E next to it, which says,
24     quote:  "Any comprehensive agreement shall be subject
25     to Sumo Yachts' approval of all terms of financing

Page 6

1      entered into by builder with respect to the vessel,"
2      period, close quote.
3          Do you know why that was included in the
4      letter of intent?
5  A.  I have no idea.
6  Q.  Were the parties thereafter always operating under the
7      understanding that Ms. Ward or Sumo Yachts would have
8      the right to approve financing?
9  A.  I don't know.
10 Q.  If you'll look at Exhibit Number 1, which is the very
11     top of that stack --
12 A.  Do you need me to go -- do you want you to through it
13     first?
14 Q.  No.  I think that would be -- that would be cruel and
15     unusual punishment.  I'm not going to ask you to do
16     that.
17          I'm going to ask you to turn to Article 15
18     which is -- and actually the part of it I want to
19     refer you to is on Page 14 of 28.
20 A.  Okay.
21 Q.  And do you see that in Section j, Article 15, Section
22     j, it talks about the owner issuing an acceptance
23     certificate?
24 A.  I see the reference.
25 Q.  And you see in Section l lower down the page, it

Page 7

1      refers to a delivery certificate?
2  A.  I see the reference.
3  Q.  Do you know if those were, if an acceptance
4      certificate and a delivery certificate were ever
5      drafted for the purposes of being attached to this
6      contract?
7  A.  I don't recall.
8  Q.  You never saw them?
9          Did you ever see them?
10 A.  I don't remember seeing -- I don't remember that.
11 Q.  Okay.  I want to ask you to look at Article 20, which
12     is on Page 18 of 28, and I'm going to ask you in
13     particular about Subparagraph c.
14 A.  Okay.
15 Q.  All right.  This was an agreement, a construction
16     agreement, was it not, under which Ms. Ward, Sumo
17     Yachts, I'll use the terms interchangeably, was not to
18     pay any money to the yard until she obtained delivery
19     of the vessel?
20 A.  That's my understanding.
21 Q.  And in Exhibit -- in Exhibit 1, Section 15(c), it
22     says that on termination, the owner may take
23     possession of the vessel and remove the vessel from
24     the shipyard after paying to the builder any monies
25     owing to the builder under this agreement less her

Page 8

1      costs as she estimated them in good faith, including
2      transport costs.
3          Here's my question.  Under this agreement,
4      what monies would she owe to the builder at the time
5      of taking possession following termination?
6          MR. MYCHALOWYCH:  I'm going to interpose an
7      objection.  I believe that the document speaks for
8      itself.  Interpretation of the document is a function
9      of the Court, and in determining what monies were owed
10     or what those terms mean, I think that's something for
11     the Court to do, and it's not relevant or appropriate
12     to ask Ms. Cassidy what she thinks of it.
13          MR. MEEKS:  Mr. Schultz, I think that's a
14     speaking objections.
15          SPECIAL MASTER SCHULTZ:  It is a speaking
16     objection, and I'd appreciate it if you didn't do that
17     any further.  That's prohibited both I think under the
18     Rules of Civil Procedure as well as our local rules,
19     and I will overrule the objection or limit it -- or
20     the question should not ask her to interpret or
21     construe the contract but to articulate her
22     understanding of it as a lawyer in the case.
23          MR. MEEKS:  Very well.
24 BY MR. MEEKS:
25 Q.  Under your understanding of this agreement, what

MEGHAN W. CASSIDY
December 6, 2007

Page 9

1    monies would the owner owe to the builder at the time
2    of termination prior to delivery?
3    A.  Well, I guess in order to answer that, are we talking
4    about what my understanding was at the time or --
5    Q.  Uh-huh.
6    A.  Because I had no involvement in the substantive
7    drafting of this agreement.  I had no -- I did no
8    analysis of the terms or anything to that effect at
9    the time this agreement was drafted.
10   Q.  Okay.
11   A.  So perhaps it might -- asking me what my involvement
12   was in this agreement might help you understand or ask
13   those questions because in terms of, of what in this
14   litigation, it's a different timeframe than what my --
15   you know, my understanding was at the time of the
16   drafting.
17   Q.  All right.  What is your understanding now of what
18   would be owed by the owner to the builder at the time
19   of the termination prior to delivery?
20   A.  I haven't looked at this clause to do any kind of
21   analysis in this litigation to take possession of the
22   vessel.  I haven't done anything like that.
23   Q.  Isn't it part of the, part of the position taken by
24   Ms. Ward in this case, that she had possessory rights
25   in this vessel as a result of terms of this contract,

Page 10

1    including this particular provision?
2    A.  I'd have to look at the Complaint.
3    Q.  Okay.
4    A.  Or the -- I'm not entirely sure right now.
5    Q.  All right.  So I assume then if I ask you about --
6    let's just try it.
7         Look at 19(b), which is on Page 18.  It
8    talks about owner defaults.  Is it true that you also
9    do not or did not have an understanding and do not
10   today have an understanding of what amounts -- amount
11   due per this agreement means in Section 19(b)?
12   A.  May I read it?
13   Q.  You bet.
14   A.  You would be correct.
15   Q.  So let me ask you then, who worked on this -- I mean,
16   this document was modified from time to time by your
17   office and sent back to the, to the builder, correct?
18   A.  Yes.
19   Q.  And who was doing -- who was making those
20   modifications?
21   A.  Andrew Mychalowych.
22   Q.  You had no involvement in it yourself?
23   A.  Substantively, absolutely not.
24   Q.  Did any other lawyer in your office edit the
25   agreement?

Page 11

1    A.  I do not believe so.
2    Q.  Okay.  Are you, therefore, Ms. Cassidy, unable to tell
3    me from what, if any, provisions of this agreement Ms.
4    Ward's alleged priority in ownership would arise from?
5    A.  I have done no analysis, you know, during the drafting
6    of this agreement that would be able to answer your
7    question.
8    Q.  Do you have an understanding today of what provisions,
9    if any, of this agreement give her priority in
10   ownership?
11   A.  No, not without conducting an analysis.
12   Q.  How about priority over any other person with regard
13   to insurance, same answer?
14   A.  Same answer.
15   Q.  All right.  I want to ask you, take you back to the
16   time of the negotiations leading up to the signing of
17   Exhibit 1.  I've seen e-mails indicating to me that
18   you've had some involvement in that process, the
19   negotiations back and forth.  Can you describe for me
20   in your words what your involvement was?
21   A.  I would say that I was a conduit of information.  I
22   coordinated conference calls.  Mr. Mychalowych would
23   ask me to follow up on a particular issue.  I had
24   absolutely no involvement in the negotiations of any
25   terms for this agreement, whatsoever.

Page 12

1         I may be asked to pass along information or
2    pass along a request for status or -- but in terms of
3    the actual contract terms, I had nothing to do with
4    that.
5    Q.  Let me ask you to look at Exhibit 44.
6    A.  I read this.
7    Q.  Okay.  I mean, isn't it true that the people that were
8    involved in the negotiations with Estaleiro Itaji in
9    2003 and 2004 understood that the yard was going to
10   get financing for the project, this vessel project?
11   A.  I don't know.
12   Q.  So how did you interpret it when Ms. Ward wrote in
13   this e-mail, Exhibit 44, on which you were copied,
14   that Metalnave -- it talks about the method of
15   financing being used by the yard, that Metalnave
16   intends to use BNDES, they will get their dollars at
17   London Libor, etcetera.
18        Didn't you understand from that that the
19   yard was going to get financing?
20   A.  I don't recall independently receiving this e-mail.  I
21   wasn't involved in that, in those discussions.
22   Q.  Let me ask you to look at Exhibit 47.
23   A.  Do you have a particular page?
24   Q.  First page.  This is another e-mail from Jackie Ward
25   on which you were copied, correct?



MEGHAN W. CASSIDY
December 6, 2007

Page 13

1   A.   The top one you're referring to?
2   Q.   Yeah, the top one, yes, yes, Ma'am.
3   A.   It looks like I was copied on that, yes.
4   Q.   Do you see that Ms. Ward said:  I do believe I
5        understood Frank to say he was planning to obtain 100
6        percent financing based on the value of LunaSea and
7        the SBLOC standby letter of credit.
8                Who do you think Frank refers to in this
9        e-mail?
10  A.   Who do I think Frank is?
11  Q.   Yeah.
12  A.   I believe it's Mr. Wlasek.
13  Q.   Who is the principal of Metalnave, correct?
14  A.   I believe so.
15  Q.   And did anybody ever tell you that Metalnave and
16       Estaleiro Itaji, I'll use the terms interchangeably,
17       were not, were not going to get financing for this
18       project?
19  A.   I don't recall.  I don't -- no one talked to me about
20       that.  I received copies of things but I wasn't
21       involved in any discussions like that.
22  Q.   If they were getting financing, wouldn't that
23       necessarily mean giving a lender a priority interest
24       in the vessel as security?
25  A.   I don't know that.

Page 14

1   Q.   You think a lender would lend 10 million dollars to
2        this yard to finish this hull and not insist on a
3        priority interest in the hull?
4                MR. MYCHALOWYCH:  Calls for speculation.
5   A.   Are we waiting for -- I don't know.
6   BY MR. MEEKS:
7   Q.   No.
8   A.   I don't know.  I didn't deal with the lenders.  I have
9        no idea what terms were involved.
10  Q.   Well, let me ask you to look at Exhibit 32.
11               MR. DAVIDSON:  It's 11.
12  BY MR. MEEKS:
13  Q.   Exhibit 11, okay.  Exhibit 11.  I'm sorry if the
14       record is unclear.
15  A.   Is there a particular page?
16  Q.   Well, I want to first try and establish whether or not
17       you remember seeing this document in July of 2004, and
18       it's an e-mail from Paulo Rolim to Jackie Ward, copy
19       to Mr. Mychalowych and Jim Eden.  It does not have
20       your name on it.  But I don't know if you saw this or
21       not.  I'm talking about at the time, not in the
22       litigation.
23  A.   I don't have a recollection of seeing this during this
24       timeframe.
25  Q.   All right.

Page 15

1   A.   Absent -- you're talking about not this litigation?
2   Q.   Right.
3   A.   Correct.
4   Q.   And we need to -- we do need to keep those separate if
5        we can because I'm really trying to ask you questions
6        as a fact witness.
7                Do you remember being told by anyone around
8        the time of this document, around late July, 2004,
9        that Estaleiro Itaji was negotiating with ABN Amro for
10       funding?
11  A.   I remember hearing the name ABN Amro because I wasn't
12       familiar with it, so I remember that -- but I didn't
13       know what, what their involvement was.  I don't have a
14       recollection of knowing that.
15  Q.   On the fourth page of Exhibit 11 --
16  A.   What is the Bates Stamp at the bottom so I make sure?
17  Q.   It's EI 0553.
18  A.   Okay.
19  Q.   And there's a section at the bottom of that page
20       entitled collateral security.  Do you remember anyone
21       telling you around this time, the summer of 2004, that
22       ABN Amro wanted a perfected first-priority pledge and
23       security interest in Ms. Ward's letter of credit?
24  A.   No, sir, I have no recollection of that.
25  Q.   Do you remember anyone telling you around the summer

Page 16

1        of 2004 that ABN Amro wanted a perfected
2        first-priority pledge and a security interest in the
3        insurance covering performance risk, in other words, a
4        performance bond?
5   A.   In that timeframe -- I don't recall that timeframe.  I
6        remember there being an issue with priority of
7        insurance, but I don't recall what the details were at
8        that time outside of this litigation.
9   Q.   Would you remember if that issue arose prior to the
10       signing of Exhibit 1, the vessel construction
11       agreement, in November, 2004?
12  A.   I don't recall.  I don't -- I don't believe so.
13  Q.   Do you remember hearing, prior to the signing of the
14       vessel construction agreement in November of 2004,
15       that ABN Amro wanted a first-priority pledge?
16  A.   I don't recall.
17  Q.   So as far as you know, this e-mail was sent to -- it
18       says it was sent to Ms. Ward, and Mr. Mychalowych and
19       Mr. Eden got copies.  As far as you know, this was not
20       discussed within your office by Mr. Mychalowych with
21       any other person?
22  A.   Not that I -- I don't know.  I don't know the answer
23       to that question.
24               Are you done with Exhibit 11?
25  Q.   Yes, Ma'am.  Just give me a second here.

MEGHAN W. CASSIDY
December 6, 2007

Page 17

1    All right. So you're not involved at all
2  in the drafting of the agreement and decisions such as
3  whether or not it would have a reference to financing
4  by the builder?
5  A. The substantive terms, no, I was not involved.
6  Q. Okay. And are you aware whether or not the decision
7  to leave out specific references to the kind of
8  financing the builder could obtain was an intentional
9  decision or an oversight?
10 A. I had no involvement in the drafting, so I can't
11    respond.
12 Q. I want to ask you to look, please, at Exhibit 26.
13    It's also Exhibit 77. We put it in twice by mistake.
14        MR. MYCHALOWYCH: Sorry, what exhibit?
15        THE WITNESS: 26.
16        MR. MEEKS: 26.
17 A. Did you want me to read the entire exhibit? Because
18    if that's the case, it will take me a few moments.
19 BY MR. MEEKS:
20 Q. No, no. I want to draw your attention to a statement
21    that's made on the second page by Mr. Mychalowych in
22    this letter.
23        MR. MYCHALOWYCH: Hang on a second.
24        MR. MEEKS: Sure.
25        MR. MYCHALOWYCH: I can't find the exhibit.

Page 18

1        MR. MEEKS: It's also 77 if you see that
2  one, same thing. It's your July 14th letter.
3        MR. MYCHALOWYCH: Okay.
4        MR. MEEKS: Okay.
5  BY MR. MEEKS:
6  Q. On the second page of this exhibit, there is a
7    statement in the second paragraph, I will ask you
8    about it and see if you remember what it refers to.
9    It says: During the course of those discussions --
10    and these are pre-signing discussions -- based on
11    concerns regarding financing on the part of Metalnave,
12    the negotiations broke down.
13        Do you remember a time between the initial
14    dealings between Ms. Ward and Estaleiro Itaji and the
15    time the contract was signed where the negotiations
16    ceased?
17 A. I remember a time where it was put on hold. I thought
18    it had to do with the standby letter of credit,
19    something having to do with -- we'd -- they'd asked
20    us -- Mr. Lobo, who is Metalnave's attorney, had asked
21    us for a draft copy of that, a form, you know, the
22    form it was going to be, and we provided that to him.
23    I believe I e-mailed it to him April or May.
24 Q. 2004?
25 A. Yes, before the execution. And then because they

Page 19

1  wanted to make sure it was approved, that was my
2  understanding, is they wanted to make sure all the
3  exhibits and everything, everybody was sure that this
4  was what was being executed and that it had been
5  approved by Metalnave or their bank or however that
6  was going to work, and they never got back to us. We
7  kept asking. I remember being asked to send e-mails
8  saying, you know, What is the status of the approval
9  of the letter of credit and getting responses saying,
10    we're waiting, we're waiting, we're waiting.
11        And I know at one point, Metalnave, I think
12    it was the summer of '04, wanted to proceed with
13    execution of the agreement, and Ms. Ward had said Not
14    until this issue relating to the standby letter of
15    credit is resolved, until we know that this is the
16    form and everything is set. And I think that's what
17    it was referring to. Now whether or not -- I know
18    that that put the project on hold for a short time.
19    Whether or not this letter is referring to that, I, I
20    do not know. That's the knowledge I have in terms of
21    the project going on hold and it stopping,
22    negotiations stopping at one point.
23 Q. So you don't remember the project being put on hold
24    because of concerns that Metalnave was not able to
25    obtain financing, for example?

Page 20

1  A. I don't have an independent recollection of that.
2  Q. You don't have a recollection, either, of the
3    negotiations being put on hold because of
4    dissatisfaction with the form of the financing that
5    Metalnave intended to obtain; is that right?
6  A. I don't know what you mean by "the form of the
7    financing".
8  Q. The terms.
9  A. I know that we were -- we didn't know what they were
10    doing. I mean, we weren't being provided any
11    information. We were sort of being kept in the dark.
12 Q. All right. So concerns regarding the terms of their
13    financing did not cause the negotiations to stop for a
14    while, fair enough?
15 A. I don't, I don't know that.
16 Q. You don't have any memory of that happening?
17 A. I don't have an independent recollection of that, no.
18 Q. Okay.
19 A. That's not to say it didn't happen. I just don't
20    know.
21 Q. Well, it's not to say it happened or didn't happen;
22    you just don't know, right?
23 A. Correct.
24 Q. In this, in this same letter, and in fact, the same
25    paragraph, the last sentence, it says, referring to

MEGHAN W. CASSIDY
December 6, 2007

Page 21

1    the time of execution: "Significantly Sumo Yachts and
2    Ms. Ward were led to believe at that time that all
3    issues regarding financing had been resolved by
4    Metalnave and the project was ready to proceed," close
5    quote.
6          Do you see that reference?
7    A. I see that sentence, yes.
8    Q. Okay. Do you have a recollection of hearing
9    statements by Estaleiro Itaji, that is Metalnave, that
10   all issues regarding financing had been resolved?
11   A. I recall seeing e-mails where they said, you know, Our
12       financing has been approved, we're good to go, can we
13       sign the agreement, something like that, wanting to
14       move forward. I recall having an understanding that
15       everything was in place for them. I believe Mr. -- I
16       believe I was present during a phone conference with
17       Mr. Lobo in Andy Mychalowych's office where that was
18       represented, and I think Paulo Rolim had also
19       represented that, he was also on that phone call, I
20       believe, and said yes -- we're talking about prior to
21       the execution?
22   Q. Yeah.
23   A. Yes, where they said, Everything is in place,
24       essentially we're good to go, can we please set up a
25       time. Because then I got very involved in setting up

Page 22

1        the meeting for the execution of the agreement.
2    Q. Okay. Yeah. I want to ask you about that conference
3        call because there's a reference in -- there was a
4        reference in Mr. Eden's deposition to a conference in
5        this case. He said there was a conference call prior
6        to the closing in Atlanta that Frank Wlasek and Lobo
7        and Rolim were on where they said they had everything
8        in place and they were prepared to sign. Mr.
9        Mychalowych says he wasn't on that conference call,
10       and I'm wondering if you were on it and he wasn't?
11   A. I don't recall that. I recall a conference call
12       beforehand where the parties, right before the
13       closing, went through literally paragraph by paragraph
14       by paragraph the agreement because I was going to be
15       going to the closing, and we wanted to make sure that
16       absolutely nothing would come up. I don't know the
17       conference call Mr. Eden is referring to. I don't
18       recall -- let me put it this way. I was never on a
19       conference call with Mr. Wlasek, Rolim, and Eden
20       without Andy Mychalowych being on that.
21   Q. That answers the question. Okay. Thank you. That
22       takes care of that.
23       So tell me if you remember -- you've
24       reviewed the e-mails leading up to the signing of the
25       vessel construction agreement prior to your deposition

Page 23

1    today, right?
2    A. In the context of discovery in this case?
3    Q. In the context of preparing for this deposition.
4    A. No, sir, I have not.
5    Q. Oh, you didn't?
6    A. I didn't review any documents.
7    Q. Well, I guess what I need to do, and I want to do it
8        in the most efficient way, Ms. Cassidy, is figure out
9        if anything was said to you orally that you heard
10       somebody say that was different from what was in the
11       e-mails?
12   A. I'm sorry, I didn't understand the question.
13   Q. Well, I know. Here's the problem. You received
14       e-mails, you saw e-mails about financing being in
15       place, right?
16   A. I recall an e-mail from Jim Eden talking about a
17       telephone call he received from Rolim, Mr. Rolim,
18       saying that he had received a call from Mr. Rolim and
19       the financing is in place. Absent looking at them
20       right now, I wouldn't know if there was any other
21       additional e-mails where that was said. I'd have to
22       look.
23   Q. All right. Let's try it this way. Putting aside what
24       was in e-mails, which presumably we've got all of
25       that, I want to know what you remember, let's say,

Page 24

1        Paulo Rolim saying about financing being in place
2        prior to the execution of the agreement, and I'm
3        including -- you were at the closing, right?
4    A. Yes, sir, I was.
5    Q. And I'm including at the closing itself, too.
6    A. My recollection is that Mr. Rolim and Mr. Wlasek and
7        Mr. Lobo had all stated it at one point and at
8        different times that their financing was in place, may
9        we -- they were very apologetic to Ms. Ward about how
10       long it had taken them. Numerous times Mr. Wlasek
11       apologized to Ms. Ward, and this is at the closing, as
12       to, you know, why it had taken so long but now that
13       everything, you know, saying that everything was in
14       place and we can move forward, you know. It was a
15       very joyous occasion, so-to-speak, for him to be
16       signing the agreement.
17       Prior to going to the closing, on that
18       phone conference where they went through the term by
19       term, it was also stated at that time that the
20       financing was in place and that the purpose of that
21       call was to make sure that there would be no surprises
22       at the closing with respect to the terms of the
23       agreement. So while I didn't participate
24       substantively in that, I was sitting in that office
25       because I was going to be the one there, but Andy

MEGHAN W. CASSIDY
December 6, 2007

Page 25

1    Mychalowych had that discussion.  But during that
2    phone call, it was represented as well that the
3    financing was in place, and this is prior to,
4    immediately prior to the execution.
5    Q.  And did anybody from your office or from Ms. Ward's
6        firm ask what the terms of the financing were?
7    A.  I don't recall if that was asked or if it was
8        something that was volunteered.  I don't know.
9    Q.  Well, I mean, you know that there was a statement in
10       July that ABN Amro wanted a first-priority mortgage.
11       Didn't somebody ask the question, Do they still want
12       that first-priority mortgage, What are the terms that
13       ABN Amro wants; did nobody inquire into that?
14   A.  Well, I remember Andy Mychalowych and Mr. Lobo
15       discussing it and it being made clear, and I think it
16       was in an e-mail to Andy Mychalowych saying, We
17       understand and the bank understands that, that you
18       have the priority, something to that effect, where
19       they said, Look, the bank knows this.  And we
20       understand that.  Because I think there was a letter
21       that was sent saying, Look -- or an e-mail that -- I
22       think it was an e-mail, I can't remember if it was an
23       e-mail or an actual letter that said, We -- you know,
24       the bank needs to understand this.  Whatever you do,
25       the bank needs to understand, you know, under the

Page 26

1        terms of the agreement -- it can't contradict the
2        terms of the agreement, and that was made clear by
3        Metalnave's attorney, either by Lobo or Rolim, in
4        response where they quoted the language in the
5        agreement saying, We understand, you know, the bank
6        understands that this is the term and that's how it's
7        supposed to be.
8    Q.  And what I want to stick to, if we can, is what was
9        said orally --
10   A.  Oh, I'm sorry.
11   Q.  -- because I do have all those e-mails, but what I
12       want to know is if anything separate from that was
13       said or if any inquiry separate from that was made by
14       the Ward side of this transaction to find out what,
15       you know, ABN Amro was going to do; what do you
16       remember?
17   A.  My recollection was just a confirmation that it was
18       understood that the terms of the agreement are the
19       terms and that this is -- that nothing contradicts
20       those terms.  That was -- that was the purpose of
21       going through that and making sure that conference call,
22       was making sure that they understood and that this is
23       what we were agreeing to sign or that they were, I'm
24       sorry, they were agreeing to sign.
25   Q.  Well, let me ask you this way.  Were you ever -- were

Page 27

1        you told prior to the closing or at the time of the
2        closing that Estaleiro has got a signed agreement for
3        funding with ABN Amro?
4    A.  That Metalnave had a signed agreement?
5    Q.  Yeah.
6    A.  I don't recall one way or the other.
7    Q.  You didn't have an understanding as to whether or not
8        the comments you heard caused you to believe they had
9        a signed agreement?
10   A.  A signed -- I was led to believe that they had their
11       funding in place 100 percent, were ready to go.
12   Q.  So you thought they had a signed agreement?
13   A.  I don't know that.  I don't know what the deal was, if
14       -- all I know is we were -- I was led to believe that
15       they had it in place.  If that meant they signed
16       documents, I don't know, if that was a representation
17       they made.  I just know what Mr. Rolim and Mr. Lobo
18       and Mr. Wlasek represented to us, me, or in my
19       presence.
20   Q.  Wasn't it important, though, and just in your function
21       as counsel to Ms. Ward, to know what the terms of that
22       loan were going to be?
23   A.  I don't -- I don't -- it had nothing to do with her
24       obligations under the agreement.  Those were set out
25       in that agreement.  Whatever they did or whatever they

Page 28

1        had to do was their own business.  I didn't have
2        anything to do with that.
3    Q.  Now when you were told that funding issues were in
4        place, that funding was in place and so forth, what
5        security did you understand ABN Amro was going to hold
6        with respect to the 10 million dollar loan?
7    A.  I didn't have any understanding at all.  I wasn't
8        involved in any discussions like that.
9    Q.  Well, wouldn't it almost always be the vessel, itself?
10   A.  I wouldn't know that.
11   Q.  You don't know that because you don't do this kind of
12       transaction; is that right?
13   A.  I didn't do this transaction.
14   Q.  Okay.  All right.  Let me just take a moment here.
15   A.  May we take a quick break?
16   Q.  Of course, yeah, whenever you want.
17           VIDEO TECHNICIAN:  The time is now 10:38
18       and 35 seconds a.m.  We are now off the record.
19           (Recess taken at 10:38 a.m.)
20           (Back on the record at 10:48 a.m.)
21           VIDEO TECHNICIAN:  The time is now 10:48
22       and 54 seconds a.m.  We are now on the record.
23   BY MR. MEEKS:
24   Q.  Ms. Cassidy, did you discuss your testimony with Mr.
25       Mychalowych during the break?

MEGHAN W. CASSIDY
December 6, 2007

Page 29

1 A. A little bit.
2 Q. What did you talk about?
3 A. Well, I asked if he thought my stomach growling would
4 show up on the microphone.
5 Q. Okay.
6 A. And I asked about distinguishing between the
7 time-frames, how, how that's difficult to do and, and
8 he said, You're doing fine.
9 Q. Okay. Let me ask you if to your knowledge there ever
10 came a time when ABN Amro took the position they would
11 not provide financing to Estaleiro Itaji on this
12 project because of its credit rating?
13 A. I recall seeing something, a document, where it
14 referenced some kind of credit report or something
15 like that, but I, I think that was produced in the
16 context of this litigation.
17 Q. Uh-huh. Do you remember anywhere where that credit
18 rating issue was tied into a failure to advance funds?
19 A. I don't understand the question.
20 Q. Do you, do you -- have you ever seen anything where
21 ABN Amro says, We're not going to fund your project
22 because of your credit rating?
23 A. Like I said, I think I saw a document that referenced
24 that they had some problem with credit.
25 Q. But did that document to your recollection deny

Page 30

1 funding?
2 A. I don't --
3 MR. MYCHALOWYCH: Objection. The document
4 would speak for itself. She's not in the position to
5 interpret somebody else's document.
6 MR. MEEKS: That's a speaking objection
7 again.
8 SPECIAL MASTER SCHULTZ: It is. I'm going
9 to from this point forward request that all the, all
10 objections with respect to any of the grounds that
11 have been mentioned this morning be made to the form
12 of the question, if that's appropriate, without
13 explanation. The local rule prevents arguing the
14 basis to the extent it coaches the witness, and of
15 course, you're permitted to make objections as to
16 attorney-client or some other privilege, but our rules
17 generally provide, except to the extent that
18 harassment is involved, that objection to the form be
19 made only. So it's overruled.
20 A. Could you repeat the question, please?
21 BY MR. MEEKS:
22 Q. Yeah. You know, I don't know if I need to bother you
23 about this. Do you have a recollection as to whether
24 or not -- I mean, the letter you're talking about is
25 the one produced during discovery?

Page 31

1 A. Yes. I'd have to see the letter.
2 Q. Okay. No, I'm not going to, I'm not going to torture
3 you with that one.
4 MR. MYCHALOWYCH: If we could just, Mr.
5 Schultz, just for purposes of clarification, my
6 understanding was that we're appearing here pursuant
7 to a subpoena that was issued before the Eastern
8 District -- from the Eastern District of Michigan, and
9 while I don't have a problem, I don't think the rules
10 are significantly different, my understanding was that
11 this deposition was being conducted pursuant to that
12 subpoena under the rules here in the Eastern District
13 of Michigan.
14 SPECIAL MASTER SCHULTZ: That's not my
15 understanding. I'm serving as Special Master pursuant
16 to an order from Judge Zloch of the Southern District
17 of Florida, and those are the rules that I'm applying.
18 MR. MYCHALOWYCH: I understand. Thank you.
19 BY MR. MEEKS:
20 Q. Let me ask you this. There is a statement in a letter
21 that Mr. Mychalowych wrote on July 14th which we
22 previously referred you to, Exhibit 26, and I don't
23 know that you need to look at it but you're free to if
24 you want --
25 A. I don't know that -- did we look at Exhibit 26 before?

Page 32

1 Q. Yeah, that's the July 14th, 2005 letter.
2 A. Okay.
3 Q. But there's a statement in it by Mr. Mychalowych that
4 reads as follows, quote: "Given the scope of the
5 undertaking, Sumo Yachts and Ms. Ward cannot fathom
6 how construction of the vessel can be completed within
7 the time set forth and remaining until the completion
8 date and still maintain superior quality standards
9 specified by the agreement," close quote.
10 A. Can you show me where you're referring to?
11 Q. Oh, sure, sure. Let me have a second.
12 I thought I had it highlighted in here.
13 I'm sorry. Hang on a second.
14 (Discussion off the record at 10:55 a.m.)
15 (Back on the record at 10:55 a.m.)
16 MR. MYCHALOWYCH: I'm sorry, what exhibit,
17 Mr. Meeks?
18 MR. MEEKS: It's Exhibit 26. I can't tell
19 you where in the exhibit, though. Younger and sharper
20 eyes are looking for it.
21 MR. DAVIDSON: Right here.
22 BY MR. MEEKS:
23 Q. There we go. Top of Page 3, Ms. Cassidy.
24 A. If you don't mind, I'd like to read the paragraph in
25 its entirety.

MEGHAN W. CASSIDY
December 6, 2007

Page 33

1  Q.  You bet.  You're absolutely entitled to that.
2           MR. MYCHALOWYCH:  26 is the same as 7?
3           MR. MEEKS:  Yeah.
4           THE WITNESS:  It's your July 14th, 2005
5      letter.
6           MR. MYCHALOWYCH:  Okay.
7  A.  Okay.
8  BY MR. MEEKS:
9  Q.  With regard to this statement that construction can't
10     be completed in time with the appropriate quality
11     standards, I want to know if you were involved in
12     consulting with any experts around about this time,
13     July, 2005, to get their impressions of whether the
14     job could be done in time?
15 A.  Yes.
16 Q.  Who did you talk to?
17 A.  There was an individual by the name of Mr. Lesky.
18 Q.  Paul Lesky?
19 A.  Paul Lesky had, in a phone conference, said there's
20     going to likely be some very serious issues with
21     quality.  This is a first-time build for this yard.
22     They've never built a motor yacht before.  And you are
23     going to sacrifice hugely on the quality.  And Mr.
24     Rolim, himself, had already raised this issue in terms
25     of the master -- there was a master ship-building

Page 34

1      schedule that was an exhibit to that agreement, and
2      Mr. Rolim had talked about how at this stage it was
3      absolutely going to need to be amended in terms of, of
4      having getting -- like he had said something about, if
5      you know, we get started -- and I think Mr.
6      Mychalowych reflects this in there, but they didn't
7      get started at that time.  So this was even later
8      after that point.
9  Q.  Let's talk about the meeting with Mr. Lesky or the
10     telephone conference.  Was that prior to this July
11     14th letter and that statement being made by Mr.
12     Mychalowych?
13 A.  I believe so.
14 Q.  Who was on that call with Mr. Lesky?
15 A.  I think it was just the three of us.
16 Q.  And what materials had he been provided with about
17     this project, if you know?
18 A.  I don't recall.
19 Q.  Do you know if he'd seen the plans at that time?
20 A.  I, I don't remember.  I mean -- well, I don't
21     remember.
22 Q.  Was he already familiar with the fact that Ms. Ward
23     was having a vessel built in Brazil?
24 A.  He was aware of that, yes.
25 Q.  Had he gone down to Brazil to the yard?

Page 35

1  A.  Not to my knowledge.
2  Q.  Had he been involved in any of the design efforts that
3      were made by Ms. Ward?  You know, she had hired Marine
4      Associates and other people to design furniture and
5      fittings for the ship.  Was Mr. Lesky involved in
6      anything like that?
7  A.  I, I know that I would have a question for him now and
8      then or I would be asked by Mr. Mychalowych to, to ask
9      him a question about a particular specification, the
10     specs -- not the interior.  I don't recall anything
11     with the interior.  One that sticks to mind is asking
12     him, having a question for him about the noise, the
13     decibel level, the noise, and asking him, reading a
14     clause to him or something like that over the phone
15     and asking him if that seemed right or if that sounded
16     appropriate and him responding to that.
17          So I don't -- if that answers, I don't know
18     if you would consider that to be involved or not.  I
19     don't.  I consider it consulting with him on a
20     particular issue.
21 Q.  Yeah, I'm just -- I'm trying to, trying to figure out
22     whether he would have had the plans or not.  You don't
23     know?
24 A.  I don't, I don't recall.
25 Q.  Did you consult with anyone else about whether this

Page 36

1      project could be completed in time as of July, 2005?
2  A.  I think -- I don't know if Mr. Linebaugh maybe was
3      involved at that time or even Mr. Eden may have
4      discussed it.  I know it was becoming a very big
5      concern because nothing was getting done.  So there
6      was a -- I can't remember the specific timeframe.
7      There was a completion date after a certain amount of
8      time after the execution, and when nothing was getting
9      done and we weren't being provided with any
10     information, you know, what was happening, what was
11     being done to the physical structure.  I know Mr.
12     Mychalowych would ask me, to find out or to check
13     status or see, you know, try to get a specific
14     understanding of where it was, what was actually being
15     done, and I think we were pretty much kept in the dark
16     in terms of it being moved forward, and that raised
17     huge concerns.
18 Q.  All right.  My question was who else you talked to.
19 A.  Oh --
20 Q.  Do you remember talking to Captain Linebaugh about
21     this, whether it could be completed in time?
22 A.  I remember having a discussion with Mr. Linebaugh at
23     one point.  I don't remember the timeframe.
24 Q.  Do you remember the substance of the discussion?
25 A.  I remember having a discussion at one point about

MEGHAN W. CASSIDY
December 6, 2007

Page 37

1   there being issues with the completion date. I don't
2   remember when that discussion took place.
3   Q. Well, what do you remember about that conversation
4   with Linebaugh?
5   A. Just that concerns were being raised about it being
6   able to get completed in the timeframe set out by the
7   agreement.
8   Q. And did he say, Yeah, you're right, they're not going
9   to make it, or something like that?
10  A. I don't -- I don't recall if he's the one who brought
11  it, who raised it with me or if I raised it with him.
12  I just remember having a discussion.
13  Q. Anybody else?
14  A. There were -- I know there were -- I can't think -- I
15  know there were other people in the industry that,
16  that we had discussed -- well, that I had, you know,
17  communications with in terms of discussions, but I --
18  I don't remember if this issue was discussed with
19  them.
20  Q. All right. What other people in the industry were you
21  talking to?
22  A. There's a gentleman in Europe. I don't remember his
23  name.
24  Q. Okay. Is he Dutch?
25  A. You mean Joop Ellenbrook (ph)?

Page 38

1   Q. Yes.
2   A. That was the paint man because I remember the name
3   Joop.
4   Q. But that's not the European you're trying to remember?
5   A. No. There was -- I can't, I can't recall.
6   Q. It wasn't Andrew North, was it?
7   A. No, no. I only spoke with Mr. North on one occasion,
8   one or two occasions.
9   Q. When was that?
10  A. Before he was hired.
11  Q. Okay. Do you remember anyone else you talked to in
12  the industry about this project?
13  A. I mean, Mr. Murray, the people at Murray -- Drew
14  Haynes, Patrick Duprey (ph), I believe his name is. I
15  had a conversation with Mr. Ellenbrook (ph) at one
16  time. Mr. Marshall, who was the interior person, I
17  discussed this project with him, you know, arranging
18  conference calls and things like that.
19  Q. He's not the European you were thinking of?
20  A. No, no. It's somebody who -- it had to do with the
21  specs and it was in the same context of how I
22  described my discussion with Mr. Lesky.
23  Q. But these conversations are pre-closing with these
24  other people in terms of putting the specs together
25  for the deal?

Page 39

1   A. Mr. Lesky, I know I had conversations with Mr. Lesky
2   after the closing.
3   Q. Right. I'm talking about the other people.
4   A. I, I can't recall. I know there were pre but I can't
5   recall if there were post.
6   Q. And you don't recall discussing with them, other than
7   Lesky and possibly Captain Linebaugh, whether or not
8   the project could be finished in time as of July,
9   2005?
10  A. I think I had a discussion with Eden about that as
11  well, Mr. Jim Eden. But as far as the other person,
12  this European, I don't recall.
13  Q. Did Eden think it could be still finished in time?
14  A. Eden had concerns, big concerns.
15  Q. All right. And when do you think the conversation
16  with Lesky was about this issue?
17  A. It was several months after the commencement date had
18  been identified, because nothing was getting done.
19  Q. But, in fact, you knew the reason that nothing was
20  getting done was because financing was not in place,
21  right?
22  A. I didn't know. I didn't know why they weren't doing
23  the work. We were trying to figure out why they
24  weren't doing the work.
25  Q. Well, isn't it true that your side of this transaction

Page 40

1   had been kept informed after the signing of the
2   agreement that negotiations were still going on with
3   ABN Amro?
4   A. No, we weren't -- we weren't told until like the
5   summer that they wanted amendments to the agreement.
6   I mean, it was a long, long time after, after the
7   agreement was executed before I, I remember having a
8   discussion with Mr. Mychalowych about them wanting to
9   now amend the agreement, and that didn't happen until,
10  I believe, the summer of '05, several months after the
11  execution of the agreement.
12  Q. My question was: Wasn't the Ward side of this deal
13  being informed that negotiations were still going on
14  with ABN Amro after the time of the closing on a
15  fairly regular basis?
16  A. Oh, I don't think so. I would disagree with that.
17  Q. All right. Let me ask you to look at Exhibit 3.
18  A. Is there a particular page or --
19  Q. Yeah, the first page, last sentence, actually the last
20  two sentences, which say -- this is from Mr. Rolim to
21  Jim Eden, and it says: "Now, with the agreement in
22  full force, they are preparing the mortgage on the
23  yacht." The "they" refers to ABN Amro. "The terms of
24  such mortgage before to be registered must be approved
25  by Ms. Ward or accepted by Ms. Ward --" there's a hole

MEGHAN W. CASSIDY
December 6, 2007

Page 41

1  right there in the middle of accepted -- "by Ms. Ward.
2  This is not only a request of the bank, as it has been
3  required, also, by Mr. Mychalowych during the
4  negotiations," close quote.
5       Now that's a reference, is it not, to the
6  same thing we talked about earlier in the letter of
7  intent which says Ms. Ward would be able to approve
8  any financing entered into by the yard?
9  A.  I don't know that that's a reference to the letter of
10 intent.
11 Q.  All right.  Well, let me ask you to look at Exhibit
12 23.  That last one was January 26, 2005.
13 A.  Are you asking me a question about --
14 Q.  No.  I'm stating that for the record.
15 A.  -- this e-mail?
16 Q.  Huh?
17 A.  Because I don't -- I don't know that outside the
18 context of this litigation I ever saw this e-mail.
19 Q.  Okay.
20 A.  Or that it was ever provided to us.
21 Q.  Okay.  Let me ask you to look at Exhibit 23.
22 A.  Okay.
23 Q.  This is from Paulo Rolim to Jim Eden, February 24th,
24 2005.  You see that Mr. Rolim says:  Today we had
25 another round with the bank and attorneys and they

Page 42

1  want nine drafts, and so forth?
2  A.  I see that.
3  Q.  Let me ask you to look at Exhibit 30.
4  A.  Do you have a question about that?
5  Q.  I did.  You answered it.
6  A.  Oh, did I see what it says?
7  Q.  Because this is building up to a question at the end.
8  A.  What exhibit?
9  Q.  Exhibit 30, please.
10 A.  Should I keep this exhibit out?
11 Q.  No, not unless you want to.  I'm not going to go back
12 to it.
13 A.  Okay.
14 Q.  Do you see this e-mail from Jim Eden to Paulo Rolim
15 discussing progress today with the bank?
16 A.  Yes.
17 Q.  Do you see that Mr. Eden says:  Let me know what you
18 learn from them by tomorrow so I can give Jackie a
19 call and an update about the progress of construction
20 on her boat?
21 A.  I see that's what the document says.
22 Q.  Let me ask you to turn to Exhibit 25.
23 A.  Okay.
24 Q.  Do you recognize this as a -- well, it's actually got
25 my secretary's name at the top.  This is something we

Page 43

1  printed from Mr. Eden's e-mail.
2       This is Rolim to Eden, March 30, 2005, with
3  the addendum the ABN attorneys were requesting.  Now
4  you may not have seen this e-mail.  Do you remember
5  this first amendment that's attached to it?
6  A.  The first time anyone on -- that I saw this, that it
7  was ever even like presented was in the context of
8  this litigation.
9  Q.  Okay.
10 A.  Are you presuming that we were provided with copies of
11 these communications between Mr. Eden and Mr. Rolim?
12 I guess I don't understand what you're asking me about
13 these.
14 Q.  Okay.  Well, let me ask you to turn to Exhibit 8.
15 A.  Okay.
16 Q.  Do you remember getting a copy of this e-mail from Jim
17 Eden to Jackie Ward, yourself, and Mr. Mychalowych,
18 copies to others?
19 A.  Okay.  May I read it?
20 Q.  Of course.
21      For the record, this is dated March 31,
22 2005.
23 A.  I remember seeing it in the context of this
24 litigation.  I don't have an independent recollection
25 of receiving it, this particular document, at that

Page 44

1  time.
2  Q.  Well, certainly this is, this is a -- this makes it
3  clear to Ms. Ward, does it not, that ABN Amro wants a
4  first lien well in advance of the summer of 2005?
5  A.  Let me look again.
6  Q.  Of course.
7  A.  Okay.  Your question?
8  Q.  My question was, this is a notification to Ms. Ward
9  that as of the date of this document, the end of
10 March, 2005, ABN Amro wants a modification of the
11 agreement?
12 A.  They wanted -- they wanted --
13 Q.  A first priority?
14 A.  -- to amend the agreement.
15 Q.  Yeah.
16 A.  I think that's what this says.
17 Q.  Right.
18 A.  I think that's what the document says.
19 Q.  It's well in advance of the summer.  You said earlier
20 the summer.  It's well in advance of the summer, isn't
21 it?
22 A.  No, I said -- I had said that in the summer was the
23 first time they had sent us any -- I hadn't seen that
24 document before is what I said.  I don't think it was
25 until the summertime that you had asked me about what

BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

11 (Pages 41 to 44)

MEGHAN W. CASSIDY
December 6, 2007

Page 45

1   ABN Amro wanted to do.  I don't have a recollection of
2   receiving this, so that was my recollection.
3   Q.  Oh, okay, all right.  But now you realize that they --
4   that this was communicated to Ms. Ward much earlier?
5   A.  That they were seeking to amend the agreement?
6   Q.  Yeah.
7   A.  I believe so.
8   Q.  Yeah.
9   A.  I mean, they wanted to amend but --
10  Q.  Let me ask you something.  Do you know who Andy North
11  was, was and is?
12  A.  I know --
13  Q.  He's still alive as far as I know.
14  A.  I know he was hired as the owner's representative.
15  Q.  And he was based in Brazil and working for Ms. Ward,
16  correct?
17  A.  He was moved to Brazil.
18  Q.  Yeah, he was living in Brazil during the term, for a
19  period of time after the vessel construction agreement
20  was signed and acting as Ms. Ward's representative to
21  the yard?
22  A.  Well, I want to clarify that.  Owner's representative
23  as that is defined under the agreement, not her
24  representative like an attorney or something like
25  that.

Page 46

1   Q.  No, of course not, no.  He was -- he was the owner's
2   representative within the meaning of the vessel
3   construction agreement living in Brazil and reporting
4   to Ms. Ward, correct?
5   A.  That was my knowledge.
6   Q.  And he made regular reports to Ms. Ward, didn't he?
7   A.  I didn't know that.  In the context of this litigation
8   I've seen things but I had not seen them -- I don't
9   recall receiving anything like that during this
10  timeframe.
11  Q.  Let me ask you to look at Exhibit 66.
12  A.  66?
13  Q.  Yes, please.
14  A.  Okay.
15  Q.  It's apparent from this that Mr. North is reporting to
16  Ms. Ward on a meeting April 1st, 2005, that there is
17  still outstanding issues preventing the release of
18  funding; isn't that true?
19  A.  Well, I didn't write this document.  I don't know when
20  it was sent to her or if it was sent to her, so I
21  can't comment on what it says.
22  Q.  You do recognize that it says:  Paulo Rolim, PR,
23  advises there are still outstanding technical issues
24  preventing the release of funding for the project?
25       MR. MEEKS:  I'm going to object as to form.

Page 47

1   This document speaks for itself.  Ms. Cassidy is not
2   copied.
3       SPECIAL MASTER SCHULTZ:  Overruled.
4   A.  I mean, I can't comment on what Mr. North meant.  I
5   don't know -- I can just tell you that's what this
6   document says.
7   BY MR. MEEKS:
8   Q.  Right, it does say that?
9   A.  PR advised that there are still outstanding technical
10  -- yes, that's what is written in the document.
11  Q.  And let me show you an April 3rd e-mail from Mr.
12  North, it's Deposition Exhibit 67, an e-mail to Jackie
13  Ward.
14  A.  Okay.
15  Q.  Do you see he's telling her on April 3rd, 2005, that
16  the funding issue is still not resolved?
17  A.  Are you asking me to, to just confirm what the
18  document reads?
19  Q.  Yeah, that's right.
20  A.  Okay.
21  Q.  This is a deposition for use at trial.  These are the
22  kind of questions we ask at a trial.
23  A.  Well, let me read the document --
24  Q.  Of course.
25  A.  -- because I'm not sure where you're referencing.

Page 48

1   Q.  Absolutely.
2       I'm sorry, I just realized you were sort of
3   asking me where.  I didn't mean to be rude.  It was
4   the third paragraph.
5   A.  I want to read the whole --
6   Q.  Absolutely.  That's what I'm referring to.
7   A.  Because I don't, I don't recall ever seeing this
8   document outside of here.
9       Okay.  And your question?
10  Q.  Do you see that he's telling her on April 3rd, 2005,
11  that the funding issue is still not resolved?
12  A.  I see what he wrote, yes.
13  Q.  Let me ask you to turn to Exhibit 68, please, Ma'am.
14  A.  Okay.
15  Q.  This is another Andy North progress report, isn't it?
16  A.  I don't -- I can't authenticate this.
17  Q.  I understand.
18  A.  I didn't write this.
19  Q.  Certainly looks like one, doesn't it?
20  A.  I can't authenticate this.  I didn't write this.
21  Q.  Do you see that in this progress report, it states:
22  The legal advisors require recognition of the bank's
23  interest for the mortgage in addition to those of Mrs.
24  Ward, and we can expect a request for a side letter
25  covering this issue shortly.

MEGHAN W. CASSIDY
December 6, 2007

Page 49

1   A.  I don't see where you're --
2   Q.  Under funding.
3   A.  Under -- oh.
4           I see where it says that.
5   Q.  And this -- and do you see also that, although this is
6       not dated, it says in the first line next Monday is
7       May 9th?
8   A.  I see where it says that.
9   Q.  Let me ask you to turn to Exhibit 70, please.
10  A.  Okay.
11  Q.  All right.  For the record, this appears to be a
12      progress report by Mr. North dated May 20th, 2005.  Do
13      you see that it states that there's a meeting between
14      Amro Bank and Metalnave lawyers reached a consensus on
15      outstanding issues on Thursday?  That's under funding.
16  A.  I see where that's written.
17  Q.  Let me ask you to look at Exhibit 72.  For the record,
18      June 2nd, 2005, progress report from Mr. North is what
19      this appears to be.
20  A.  I'm at the exhibit.
21  Q.  Okay.  Do you see there's another bit of information
22      about funding here -- strike that.
23          Do you see there's further information
24      about funding here which reads as follows:  Following
25      the recent lawyers meeting, an export prepayment

Page 50

1       agreement has been drawn up with associated terms and
2       conditions.  I am advised that a letter is to be sent
3       to Andy Mychalowych presenting the basis of this
4       agreement and requesting agreement acknowledgment from
5       the owner of the terms of this agreement as required
6       by the vessel construction agreement.  Subject to this
7       being given, then I believe that the funding will be
8       released.
9           Do you see that, Ma'am?
10  A.  I see it in the document.
11  Q.  Let me ask you to turn to 73.
12  A.  Okay.
13  Q.  Now I want you to look at the bottom e-mail, please,
14      on 73.  That's from Mr. Lobo to Mr. Mychalowych, June
15      9th, 2005.
16  A.  I'm not copied on this.
17  Q.  I know that.
18  A.  Okay.
19  Q.  You see that Mr. -- Dr. Lobo, he's a lawyer in Brazil,
20      is informing Mr. Mychalowych about the current status
21      of the negotiations with ABN Amro?
22  A.  Well, I see what he's written.  I can read the
23      document.
24  Q.  Good.  Let me have the July 4th letter, Matt.
25          I'm going to ask you to go back to Exhibit

Page 51

1       26.
2           (Discussion off the record at 11:21 a.m.)
3           (Back on the record at 11:21 a.m.)
4   A.  Okay.
5   BY MR. MEEKS:
6   Q.  All right.  And do you see on the third page, Mr.
7       Mychalowych says in his July 14th, 2005 letter:  More
8       recently prompted by repeated inquiries on the part of
9       Sumo Yachts and its owner's representative, we learned
10      that Metalnave has not, in fact, secured financing for
11      the construction of the vessel and was continuing to
12      negotiate with its financial institution, ABN Amro.
13      This news was a complete surprise to Sumo Yachts and
14      Ms. Ward as we were led to believe at the time of the
15      execution of the agreement that Metalnave had its
16      financing in place.
17          Can you explain to me, in view of all the
18      documents we just went through, how it was a, quote,
19      "complete surprise," close quote, in mid July that the
20      financing was not in place?
21  A.  Because I think the  -- I mean, I'd have to go, put
22      all the e-mails together.  Can we get them all
23      together again?
24  Q.  Sure, you can do that.
25  A.  What are all the numbers?

Page 52

1   Q.  3.
2   A.  Okay.  In terms of 3, I don't know that, first of all,
3       Mr. Eden passed this information on to anyone.  I
4       recall seeing an e-mail where Mr. Eden actually told
5       Mr. Rolim to keep this quiet and not telling anyone
6       about funding issues.  I do recall seeing an e-mail in
7       the context of this litigation where he was saying, I
8       hope you didn't tell Ms. Ward about this, or something
9       like that.  So I don't know if this was before or
10      after that e-mail.  So as far as Exhibit 3, I don't
11      know that this was ever passed on to us.
12  Q.  Who was telling who?
13  A.  I believe there's an e-mail where Jim Eden -- Mr.
14      Rolim had e-mailed Jim Eden about something, and Mr.
15      Eden wrote back and said, I hope you don't -- you're
16      not telling anyone about this, you know, you got to
17      get it together kind of thing, and I believe that was
18      produced in the context of this litigation.  We had
19      never seen anything like that before.
20  Q.  All right.  If you take out the Eden, the Eden
21      e-mails, the Rolim/Eden e-mails --
22  A.  Okay.  And what was the other numbers?
23  Q.  There's 3, 23, 30, that an Eden, 25 --
24  A.  Okay, 23 is an Eden.  I don't recall ever, other than
25      the litigation, having seen anything like this about

MEGHAN W. CASSIDY
December 6, 2007

Page 53

1    any kind of documents.  So 23 wouldn't be considered
2    as well.
3  Q. Let me ask you this.  You believe then that it really
4    was a complete surprise that the funding was not in
5    place --
6  A. No --
7  Q. -- and that was learned in July, 2005?
8  A. We were led to believe that they had their funding in
9    place, that it was good to go and ready to go.  Now
10   these are referencing the mortgage, which the vessel
11   construction agreement didn't, to my knowledge, and
12   that's in the context of this litigation, didn't
13   prevent them to have a mortgage.  It's just they had
14   to deliver it free and clear of the mortgage when it
15   was all said and done in order to get that standby
16   letter of credit handed over.
17       So I think that my understanding was, Look,
18   you know, you told us you had funding in place all of
19   this time.  You know, we're asking what's going on,
20   what's the status, you know.  And then it wasn't until
21   the summer that they first started sending this stuff.
22  Q. So you would agree then with Mr. Mychalowych's
23   statement in July that it was a complete surprise that
24   Metalnave, that is Estaleiro Itaji, was continuing to
25   negotiate with ABN Amro?

Page 54

1  A. That, that they didn't have their funding in place was
2    a surprise to us.
3  Q. The statement is:  That we learned that Metalnave has
4    not, in fact, secured financing and was continuing to
5    negotiate with its financial institution, ABN Amro,
6    this news was a complete surprise to Sumo Yachts and
7    Ms. Ward.
8       You think that's a correct statement, it
9    was a complete surprise?
10  A. If you -- you have to take it all --
11  Q. If you do, it is.
12  A. Well, may I answer?
13  Q. Of course.
14  A. In the context of everything that was going on where
15   we were asking them -- remember, there was a
16   representation to us about funding being in place,
17   which is why Ms. Ward to my knowledge went through
18   with signing the agreement, and then there was the
19   issue of getting commencement date to go, but we were
20   always led to believe that the financing was in place.
21       Now whether or not that released the
22   funding or what was the deal on their end, we were not
23   privy to that.  So the fact that all of a sudden they
24   tell us that they just don't even have a financing in
25   place, to my knowledge that was a surprise.

Page 55

1  Q. Is it possible it was a surprise to your law firm but
2    not to Ms. Ward?
3  A. I wouldn't -- I don't believe so.
4  Q. Why don't you believe that?
5  A. Because if we had been notified by Lobo, Lobo was
6    communicating with Mr. Mychalowych, he wouldn't have
7    been communicating with Ms. Ward directly I don't
8    believe unless it was copying her on something.
9  Q. Well, you saw Eden's statement in Exhibit 30 that, Let
10   me know so I can update Jackie; do you have any reason
11   to believe he wasn't keeping her up-to-date?
12  A. I don't know.  You'll have to ask Mr. Eden or Ms. Ward
13   what their communications were.
14  Q. I mean, you saw in Exhibit 8 Ms. Ward saying, How do
15   we determine funding and the ABN Amro situation, that
16   was --
17  A. Exhibit what?
18  Q. Exhibit 8, the date of that --
19       (Discussion off the record at 11:26 a.m.)
20       (Back on the record at 11:27 a.m.)
21  A. Well, funding is not -- the funding of the build is
22   different than having financing in place.
23       MR. MEEKS:  Okay.
24       SPECIAL MASTER SCHULTZ:  May we take a
25   two-minute break?

Page 56

1       MR. MEEKS:  Yeah.  Can we take a five?
2       SPECIAL MASTER SCHULTZ:  Sure.
3       MR. MEEKS:  Okay.
4       SPECIAL MASTER SCHULTZ:  That'll be fine.
5       VIDEO TECHNICIAN:  The time is now 11:25
6    and 59 seconds a.m.  We are now off the record.
7       (Recess taken at 11:25 a.m.)
8       (Back on the record at 11:33 a.m.)
9       VIDEO TECHNICIAN:  The time is now 11:33
10   and 30 seconds a.m.  We are now on the record.  This
11   begins tape number two.
12  BY MR. MEEKS:
13  Q. Let me ask, Ms. Cassidy, about a statement that was
14   made in a pleading filed by your office or paper filed
15   by your office in Michigan.  There was a motion to
16   quash.  And it says at one point that Estaleiro
17   refused to build the yacht.  You may not have written
18   that statement but do you remember any time, at any
19   time Estaleiro refusing to, to build this vessel prior
20   to the termination letter from Mr. Mychalowych on
21   September 15th --
22       MR. MYCHALOWYCH:  I'm going to object --
23       MR. MEEKS:  Can I finish my question,
24   please?
25       MR. MYCHALOWYCH:  I'm sorry.

MEGHAN W. CASSIDY
December 6, 2007

Page 57

1  BY MR. MEEKS:
2  Q.  -- prior to September 15th, 2005?
3          MR. MYCHALOWYCH:  I'm going to object.
4  That's clearly work product and privileged.
5          MR. MEEKS:  I'm asking if, just so we're
6  clear on this, I'm asking if my client ever refused to
7  build the yacht prior to the termination letter from
8  Mr. Mychalowych.  I don't see how that could be work
9  product.
10         MR. MYCHALOWYCH:  Outside of the reference
11 to our pleadings?
12         SPECIAL MASTER SCHULTZ:  Wait a minute,
13 wait a minute.  Ms. Cassidy --
14         THE WITNESS:  Yes, sir.
15         SPECIAL MASTER SCHULTZ:  -- I don't want
16 you to answer anything that would fall in the category
17 of work product, which I'm sure you understand, or
18 attorney-client privilege.  If you know as a factual
19 matter whether or not they refused to build the yacht,
20 please state so.
21 A.  Well, you asked me about a document.  Can you show me
22     the document you're talking about?
23 BY MR. MEEKS:
24 Q.  Sure.  It's -- oh, you mean the document, the motion
25     to quash?

Page 58

1  A.  You just referenced a document.
2  Q.  Yeah.  I don't actually have it here.  It's a motion
3      to quash that was filed by your firm in this district,
4      in the Eastern District of Michigan.  But the
5      statement was simply that Estaleiro refused to build
6      the yacht.  I just -- I just, you know, I just want to
7      know if you have any recollection of my client ever
8      refusing to build this yacht prior to Mr.
9      Mychalowych's termination letter?
10 A.  Yes.
11 Q.  Okay.  Tell me about that.
12 A.  They told us they weren't proceeding forward because
13     they weren't getting the financing unless we amended
14     the agreement.
15 Q.  Okay.  All right.  And when did that happen?
16 A.  It happened on several occasions where they asked that
17     the amend -- that the agreement be amended.  I just
18     don't remember the timeframe.
19 Q.  Okay.  So you're saying that whenever they amended --
20     when they asked for the agreement to be amended, they
21     were refusing to build the yacht?
22 A.  Yeah, they were saying -- I know that there was a
23     timeframe where a discussion was had about, Okay,
24     well, if, if Frank Wlasek, Mr. Wlasek puts up -- you
25     know, there was some negotiations that were going on

Page 59

1      about Mr. Wlasek putting up some kind of guarantee and
2      then maybe we'll talk about doing an amendment if that
3      were to occur.  But they, Metalnave when I say "they,"
4      they were very clear they weren't moving forward
5      because they weren't going to put up the money.
6  Q.  They weren't going to fund 10 million dollars without
7      a bank; that's what they were saying, right?
8  A.  I don't know that that's what they specifically said
9      but they were not moving forward with the building of
10     the vessel.
11 Q.  And the reason that they weren't is because they
12     wanted an amendment to the transaction documents; is
13     that what you're saying?
14 A.  I can't answer.  I know that they were asking for an
15     amendment at the time, and without that amendment,
16     they were not building the boat.
17 Q.  All right.  I earlier showed you Exhibit 11, which was
18     the -- and if you want to refresh your recollection,
19     it was the July terms from ABN Amro.  I'm not going to
20     ask you about that again, just to sort of get that in
21     place.
22         (Discussion off the record at 11:38 a.m.)
23         (Back on the record at 11:38 a.m.)
24 BY MR. MEEKS:
25 Q.  I'm going to ask you also, you know, go ahead and get

Page 60

1      --
2  A.  This was the e-mail -- I was not copied on this
3      e-mail, so I can't comment on it.
4  Q.  I know.  I want you to also get out 13 and 14, if you
5      will, please.
6  A.  Okay.  I have them in front of me.
7  Q.  Okay.  Now in August did you see Exhibit 13 from Paulo
8      Rolim to Jackie Ward?
9  A.  I've seen it since then.  I don't have an independent
10     recollection of, of receiving it at that time.
11 Q.  It does indicate you were copied, doesn't it?
12 A.  It -- yes, my e-mail address is at the top.
13 Q.  That's your correct e-mail address?
14 A.  Yes.
15 Q.  At the time?
16 A.  At the time, yes.
17 Q.  And, and do you see in Paragraph 4 that Mr. Rolim says
18     to Ms. Ward in response, I believe, to Mr.
19     Mychalowych's letter about senior position that
20     referred to before that "During this visit," to ABN
21     Amro that is, "we also discussed financial details of
22     the loan, in special the mortgage on the vessel, and
23     the quote, 'senior position', close quote, of Sumo
24     Yachts who could elect to take possession of the
25     vessel under shipyard default.  ABN Amro acknowledged

MEGHAN W. CASSIDY
December 6, 2007

Page 61

1 this and is open to introduce in the mortgage contract
2 such restriction, subject of course to the payment by
3 Sumo Yachts the amount disbursed according to the
4 building stage," close quote.
5 Now do you have any reason to believe that
6 this e-mail was not sent by Paulo Rolim to Jackie
7 Ward, copies to Mr. Mychalowych and you and others on
8 August 13th, 2004?
9 A. Do I have a reason to believe it was not sent?
10 Q. Right.
11 A. No. The top indicates that it appears to have been
12 sent.
13 Q. And let me ask you to look at 14, Exhibit 14.
14 A. Okay.
15 Q. Do you recognize this as an e-mail you received from
16 Mr. -- Dr. Lobo's firm in Brazil attaching the
17 proposal made by ABN Amro?
18 A. In the context of this litigation, I recognize this
19 e-mail. I don't remember it at that time. But I do
20 see that it was sent to me. Now it doesn't have my
21 e-mail address but it appears to have been sent to me.
22 Q. Yeah, I'm presuming this was printed out of your pst
23 file?
24 A. Yes. Well, not a .pst file. We don't have any
25 archives. But yes, it's in the In box saved.

Page 62

1 Q. Oh, I see. Oh, it's live?
2 A. Yes.
3 Q. How many e-mails --
4 A. Don't ask.
5 Q. Okay. Never mind. All right. So anyway, you have no
6 reason to believe that this is not accurate, accurate
7 and what it appears to be, a proposal from ABN Amro
8 sent to you by Dr. Lobo's office shortly before,
9 almost immediately before the Atlanta closing of the
10 vessel construction agreement?
11 A. I believe this was sent to my e-mail.
12 Q. And did you think -- did you think that somehow ABN
13 Amro had backed off its position and was no longer
14 insisting on a first position?
15 A. I did no analysis on this, whatsoever.
16 Q. And you sent this to Ms. Ward by fax, correct?
17 A. I don't know if I faxed it or if it was e-mailed or
18 how it was transmitted at all.
19 Q. But you do remember transmitting it immediately to Ms.
20 Ward?
21 A. I don't recall transmitting it. I believe I would
22 have sent it to Mr. Mychalowych first.
23 Q. All right. Let me ask you to look at Exhibit 59.
24 A. Okay.
25 Q. Did you find it okay?

Page 63

1 A. I did.
2 Q. Just take a minute and just read through it, if you
3 don't mind.
4 A. I see this.
5 Q. And do you see in the fourth paragraph, it says,
6 quote, you write, quote: "We have received a letter
7 from Mr. Lobo setting forth the financing approval
8 between Metalnave and ABN Amro. Our scanner is not
9 cooperating, so I am having the letter faxed to you as
10 I write this e-mail," close quote.
11 Does that refresh your recollection that
12 you faxed the financing approval to Ms. Ward?
13 A. I remember -- now it does refresh my recollection.
14 This is a date prior to the November 4th e-mail. This
15 is November 3rd. I remember it was sent to us, and it
16 was a horrible faxed version, and I -- I think that is
17 why the November 4th e-mail was sent, because it was
18 such a horrible copy.
19 Q. And then you passed on that e-mail to Ms. Ward?
20 A. I don't -- I don't recall how that happened after
21 November 4th because I believe -- I believe so. I
22 just don't recall.
23 Q. Okay. How do you think you -- you got an e-mail after
24 this Exhibit 59 that had the, the financing approval?
25 A. Yes, I believe I wrote to Mr. Lobo and said, We can't

Page 64

1 read your copy.
2 Q. Yeah, I've seen that. But then how did you then get
3 that to Ms. Ward?
4 A. I don't recall. I'd have to look at all the
5 documents.
6 Q. But you did?
7 A. I don't know one way or the other. I'd have to look.
8 Q. Do you think Mr. Lobo sent it to Ms. Ward at your
9 request?
10 A. He may have. I don't know.
11 Q. Look at 61. I think that's what happened.
12 And this for the record is dated November
13 4th, 2004, so I think you're quite right, you didn't
14 send it.
15 A. Okay. I mean, I see the exhibit.
16 Q. Yeah.
17 A. I don't know. I'd have to look and compare them to
18 see if it's the exact same thing, but I see what
19 you're referring to.
20 Q. But certainly what was sent to Ms. Ward now, it would
21 appear from this document, what was sent to Ms. Ward
22 by Dr. Lobo on November 4th, 2004, was an ABN Amro
23 proposal which specifically said that they would have
24 to have a mortgage equivalent to certain percentage of
25 total exposure and performance insurance, correct?

BIENENSTOCK
COURT REPORTING & VIDEO
248.644.8888

16 (Pages 61 to 64)

MEGHAN W. CASSIDY
December 6, 2007

Page 65

1   A.  Where -- which -- can you show me where you're
2       referring?
3   Q.  Yeah, second page of Exhibit 61.
4   A.  I see where the document says that.  It talks about
5       there being a mortgage.  But as I said before, I don't
6       think that the vessel construction agreement
7       prohibited a mortgage.  It had to do with when the
8       vessel was delivered free and clear of that mortgage.
9   Q.  Right.  So there could be -- it was really a delivery
10      problem, wasn't it?
11  A.  I don't know.  I just know that there is a term in
12      that agreement that says free and clear.
13  Q.  And so long as what she eventually got was free and
14      clear of any liens or encumbrances, the agreement
15      would be satisfied with respect to mortgages?
16          MR. MYCHALOWYCH:  Calls for a legal
17      conclusion.
18  BY MR. MEEKS:
19  Q.  You can answer.
20  A.  I haven't analyzed the agreement in terms of at that
21      time.  But what I'm saying is I know there's language
22      in the agreement that talks about free and clear of
23      liens and encumbrances.  I'd have to look at -- I
24      don't know what the delivery procedure is.  I'm not
25      sure sitting right here.

Page 66

1   Q.  Okay.
2   A.  I just -- I just know that there is language, from the
3       context of this litigation, that requires that it be
4       delivered free and clear.
5   Q.  Right, and wasn't that the concern on the Ward side of
6       this transaction, that what was being asked for was
7       not going to allow that to happen?
8   A.  I don't know.  At this timeframe I was not involved in
9       those issues.  I wasn't involved at all in, in any of
10      the discussions relating to the terms of the agreement
11      at that time.
12  Q.  All right.  Would you look at Exhibit 88, please, it
13      should be the bottom one.
14          MR. MYCHALOWYCH:  I'm sorry, which one?
15          MR. MEEKS:  88.
16  A.  The letter from Mr. Lobo?
17  BY MR. MEEKS:
18  Q.  Right.
19  A.  Or his firm.  Okay.
20          MR. MYCHALOWYCH:  88?
21          THE WITNESS:  88.
22          MR. MYCHALOWYCH:  I'm sorry.  I don't know
23      that I have an 88.
24          THE WITNESS:  This still has the original
25      sticker on it, so I don't know if --

Page 67

1           MR. MEEKS:  I'll tell you what.  Let's --
2       let's take five and get it copied for everybody.
3           MR. MYCHALOWYCH:  Wait a second.  Is this
4       it?
5           MR. MEEKS:  Yeah, uh-huh.
6           MR. MYCHALOWYCH:  Okay.
7           MR. MEEKS:  Now we've got to find ours.
8       Hang on.
9           I'm going to have to borrow the original
10      from Ms. Cassidy and make a copy.
11          MR. MYCHALOWYCH:  Do you want to go off for
12      a couple seconds?
13          MR. MEEKS:  Yeah, can we just go off.
14          VIDEO TECHNICIAN:  The time is now 11:47
15      and 35 seconds a.m.  We are now off the record.
16          (Recess taken at 11:47 a.m.)
17          (Back on the record at 11:50 a.m.)
18          VIDEO TECHNICIAN:  The time is now 11:50
19      and 33 seconds a.m.  We are now back on the record.
20  BY MR. MEEKS:
21  Q.  Ms. Cassidy, you have in front of you, I believe,
22      Deposition Exhibit 88?
23  A.  Yes, sir.
24  Q.  Let me ask you as a possible way of short-cutting
25      this, did you -- have you ever analyzed the terms of

Page 68

1       this proposal?
2   A.  What do you mean "this proposal"?
3   Q.  The proposal by -- this is a proposal -- all right.
4       Let me go back.
5           Exhibit 88 is a proposal, regards a
6       proposal by ABN Amro for financing, correct?
7   A.  Mine has several pages on the other side, second page.
8       Is it the same thing you have?
9   Q.  It's two-sided.  I think she -- it was a two-sided
10      copy.
11          All right, where's yours?
12  A.  And I'm not sure if this is the whole because one says
13      draft on it.
14  Q.  Yeah.  No.  The actual Exhibit 88 has got more pages.
15          I'm sorry, we're going to have to break
16      again.
17          Ask Grace to make -- it's two-sided.  Ask
18      Grace to make it one-sided, to make five of them.
19          VIDEO TECHNICIAN:  The time is 11:51 and 43
20      seconds a.m.  We are now off the record.
21          (Recess taken at 11:51 a.m.)
22          (Back on the record at 11:53 a.m.)
23          VIDEO TECHNICIAN:  The time is now 11:53
24      and 55 seconds a.m.  We are now back on the record.
25  BY MR. MEEKS:

MEGHAN W. CASSIDY
December 6, 2007

Page 69

1  Q. All right. Do you have in front of you, Ms. Cassidy,
2     a copy of Exhibit 88?
3  A. I believe so, yes.
4  Q. Yes. And do you remember seeing this on or about
5     August 4th, 2005?
6  A. I remember seeing this. I don't remember when it was.
7  Q. Was it before the litigation started?
8  A. I believe so, yes.
9  Q. Because it didn't start for several months later,
10    right?
11 A. Correct.
12 Q. So do you remember analyzing this? I have a lot of
13    questions to ask you about this if you analyzed it at
14    the time. Did you, did you peruse this and consider
15    the effects of these, these proposals on your client?
16 A. I don't believe I did at the time. I may have had
17    discussions about it, but I don't believe I did any
18    independent analysis.
19 Q. Did you reach any conclusions as to whether your
20    client might be better off with ABN Amro involved in
21    this transaction?
22 A. In August of '05?
23 Q. Yeah.
24 A. I don't -- one way or the other I don't know.
25 Q. Okay. Did you -- do you remember reading the mortgage

Page 70

1     release certificate which is Page EI 46?
2  A. At some point I did. I don't --
3  Q. At some point in --
4  A. I don't recall if it was in the context of this
5     litigation or then.
6  Q. Oh, you don't know if it was recently or back then,
7     well, okay. But you do understand that under this
8     mortgage release certificate as it was proposed, Ms.
9     Ward would receive delivery of the yacht, and her
10    letter of credit would not be drawn on for another 24
11    hours, don't you?
12        MR. MYCHALOWYCH: Calls for a legal
13    conclusion.
14 A. I understood that in -- I mean, when this letter came,
15    you got to remember in August of '05, nothing had been
16    done on the vessel at this point. It was I think an
17    18-month build. So, I mean 10 months in, I think,
18    from the signing of it. So I don't know -- I mean --
19    whatever it is they were doing, they were making this
20    offer, but I don't think it was covering everything.
21    I think it was sort of -- it didn't address all the
22    other concerns that, I think, were being raised at
23    this time. It was just sort of, okay, here's this
24    issue, and there was nothing else with it. They had
25    already said we're going to have amend the building

Page 71

1     time at that point. So whether or not that
2     accomplished it, I haven't looked at it, but whether
3     that would make things better, I don't think so.
4  BY MR. MEEKS:
5  Q. So you don't -- you don't have an opinion today as to
6     whether or not this proposal from August 4th, 2005,
7     answered the concerns about her priority interest that
8     had been raised by Mr. Mychalowych during 2005?
9  A. Well, I think today my analysis of that and any
10    thoughts I would have on that would be considered work
11    product because it's in terms of this litigation.
12 Q. Right. I'm asking whether you -- you reached any
13    conclusion before the litigation started as to whether
14    or not this proposal satisfied the concerns that Mr.
15    Mychalowych had raised about her alleged priority
16    interest?
17 A. No, because I think there were other concerns raised.
18    I think it wasn't just the priority interest that was
19    raised. I think there were other things going on at
20    the time.
21 Q. Right, but I'm asking you to focus on the alleged
22    priority of interest that Mr. Mychalowych seems to
23    believe Ms. Ward had in the yacht. Did you reach
24    conclusion before the litigation began as to whether
25    or not, as to that issue, these ABN Amro proposals

Page 72

1     solved that problem?
2  A. Okay. Well, when you use the term priority, I want to
3     make sure we're on the same page because I think there
4     was a priority issue not only with the delivery, but I
5     remember there being a priority issue with the
6     insurance. I don't think that addressed the insurance
7     issue.
8  Q. Do you think it did address the delivery issue?
9  A. I think it was a part of, of trying to get closer to
10    resolving the issues, but there were far more issues.
11    It did address the delivery portion but there were far
12    more concerns being raised that were not being
13    addressed by the defendants.
14 Q. Why don't you tell me what the insurance issue was?
15 A. If I recall correctly, it was that Ms. Ward/Sumo
16    Yachts would have the priority on the insurance if
17    there had been a total loss, something to that effect.
18    I didn't see any insurance policies. I remember we
19    were asked at -- they were required to provide those.
20    I don't recall if they ever actually did.
21 Q. How was -- how was her -- how were her insurance
22    rights going to be negatively affected by what was
23    being proposed?
24 A. What was being proposed, they weren't addressing the
25    issue.

MEGHAN W. CASSIDY
December 6, 2007

Page 73

1  Q. Well, doesn't that mean her rights would not be
2     affected; how were they going to be affected?
3  A. No. I think that Metalnave -- if memory serves me, I
4     think Metalnave was saying that, that we needed --
5     they were asking to amend the Complaint or -- I'm
6     sorry -- amend the agreement so that the bank now had
7     the first -- and if this is the right term -- a first
8     position to get the proceeds from any insurance
9     company, and that's not what -- the agreement
10    specifically, I think, provides differently. I'd have
11    to look at the agreement but I think it provides
12    differently.
13 Q. Why don't you do that in Exhibit 1. Let's figure that
14    out.
15 A. And, and I guess this question -- this goes back to I
16    remember there being -- and I don't know if you want
17    to continue with this -- there being discussions about
18    the insurance issue. Outside of analyzing this
19    agreement, though, I did no analysis at that time of
20    the terms of the agreement.
21 Q. I'm not following you.
22 A. Well, I can say I remember there being discussions
23    about them wanting to amend the agreement so that --
24    because I was using it in the context of you using the
25    term priority. I remember there being an issue with

Page 74

1     priority as to the delivery issue and priority as to
2     the insurance issue. Now I didn't do any analysis at
3     that time over, you know, the Exhibit 88, whether it
4     addressed those two priorities that we're talking
5     about. You're asking me to look at the agreement. I
6     think the agreement provides that, that Ms. Ward or
7     Sumo Yachts has priority on the insurance policy, like
8     she gets paid, you know, her amounts that she has
9     invested first over a total loss or something like
10    that, but my understanding of that is based on this
11    litigation, not at the time.
12       MR. MYCHALOWYCH: Mr. Schultz, if we could
13    get some guidance, I think this is a similar issue
14    that arose yesterday in that it's either work product
15    or she's being asked to analyze and provide an opinion
16    today where she suggests that she had not done so
17    previously.
18       SPECIAL MASTER SCHULTZ: All right. Mr.
19    Meeks, can you restate the question, please?
20       MR. MEEKS: Yes.
21 BY MR. MEEKS:
22 Q. What I'd like to know is why -- let me give this
23    another shot.
24       I'm trying to understand why there was an
25    insurance issue in the summer of 2005 that couldn't

Page 75

1     simply be resolved by the procurement of additional
2     insurance?
3  A. I think that that was -- and I'm -- I think that that
4     was discussed as being an issue, you know, a
5     possibility, but Metalnave never brought those
6     possibilities as a means of resolving the issues.
7  Q. Did they refuse to get additional insurance to protect
8     her?
9  A. I don't know those, the discussions, whether or not
10    they offered to, didn't offer to, said no, and I think
11    it was in the context of this litigation and reviewing
12    documents I seem to recall saying -- some
13    communications between the counsel saying this could
14    be resolved that way, but Metalnave never coming back
15    and actually saying, okay, this is one more thing
16    we'll do.
17       At the time of Exhibit 88, the only thing
18    that it looks, if you read it, they're addressing is
19    the, the delivery portion of it.
20 Q. Yeah.
21 A. There were, like I said -- my recollection is there
22    were other issues involved at that time that were
23    causing concerns, and we talked about the, the fact
24    that at that time nothing had been done on the boat.
25    So they didn't address any of those other things, and

Page 76

1     I think that was what was causing a problem.
2  Q. Okay. But I can only deal with them individually
3     so --
4  A. Okay.
5  Q. -- we talked about delivery. Now I want to talk about
6     insurance. Because I don't understand why it wasn't
7     just possible to purchase additional insurance to
8     protect her if, in fact, that was even necessary.
9        How was it that it was felt the, her
10    insurance rights were going to be adversely affected?
11 A. They wanted to amend the agreement to make her change
12    her rights under the agreement relating to insurance.
13    I'm not saying I looked at one way or the other. I
14    just know they wanted to amend a clause in the
15    agreement that would affect her rights to insurance
16    proceeds.
17 Q. Well, are you talking about request that the bank
18    become a co-insurer?
19 A. I don't think they wanted to be co. They wanted to be
20    first. I believe so.
21 Q. And that would have adversely affected her how?
22 A. Well, because the agreement provides that she was
23    first.
24 Q. Yeah --
25 A. And they wanted her -- they wanted her to subordinate

MEGHAN W. CASSIDY
December 6, 2007

Page 77

1    to the bank.
2  Q.  Okay.  Hold on a second.
3         (Discussion off the record at 12:05 p.m.)
4         (Back on the record at 12:05 p.m.)
5  BY MR. MEEKS:
6  Q.  Isn't it true that as long as her costs, whatever
7      costs were going to be covered by insurance in the
8      agreement, identified in the agreement, are still
9      covered by insurance, does it really matter if there's
10     somebody else involved in the same policy; how would
11     that effect her risk?
12 A.  Well, because the boat was going to -- from what Paulo
13     Rolim and Frank Wlasek and everybody involved, Jim
14     Eden, they all said this boat was going to be worth a
15     heck of a lot more than what they -- she was paying
16     for, so --
17 Q.  Right, and under these terms --
18 A.  Well, can I finish?
19 Q.  -- she was going to get it for 10 million dollars?
20 A.  11.8 million, I believe.
21 Q.  But her standby letter of credit was only 10 million?
22 A.  No, it was 11.8 million.
23 Q.  You're right.  The bank loan was 10 million?
24 A.  I don't know.
25 Q.  At the most that she would ever have to owe -- well,

Page 78

1      all right, we're just going to argue about that.
2      Okay.  Never mind.  There's no point in doing that.
3         Do you know if Ms. Ward is the sole owner
4      of Sumo Yachts?
5  A.  Sir, I don't know.
6  Q.  Do you have any Portuguese speakers in your office?
7  A.  No, not to my -- well, not to my knowledge.
8  Q.  To your knowledge does Ms. Ward have any in her
9      office?
10 A.  I do not know.
11        MR. MEEKS:  Just one second.
12        (Discussion off the record at 12:07 p.m.)
13        (Back on the record at 12:07 p.m.)
14 BY MR. MEEKS:
15 Q.  Did you review a calendar before you came to the
16     deposition today?
17 A.  No, sir, I did not.
18 Q.  Could you tell me approximately how many calls you
19     think you had with Frank Wlasek?
20 A.  How many telephone calls?
21 Q.  Yeah.
22 A.  Personal -- when, like today?
23 Q.  Prior to the signing of the agreement.
24 A.  I don't, I don't know.
25 Q.  How about with Paulo Rolim?

Page 79

1  A.  Where I, like personal phone calls with them?  I don't
2      recall.
3  Q.  Or conference calls?
4  A.  I remember at least two that I was sitting in on.
5      There may have been more in terms of scheduling.  I
6      think most communication was by e-mail.
7  Q.  When do you think Estaleiro breached the vessel
8      construction agreement?
9  A.  I'd have to analyze it.  In the context of outside of
10     this litigation, I haven't done any kind of analysis
11     or was involved in anything like that.
12        (Discussion off the record at 12:08 p.m.)
13        (Back on the record at 12:09 p.m.)
14        MR. MEEKS:  All right.  I don't have any
15     further questions.  Thank you very much, Ms. Cassidy.
16        THE WITNESS:  Thank you.
17        MR. MYCHALOWYCH:  I have no questions at
18     this time.
19        SPECIAL MASTER SCHULTZ:  Okay.  As you guys
20     recall, the court's order requires that I file a
21     report within ten days regarding these depositions.
22     I'm not entirely clear what kind of details are
23     required for that, but what I have in mind is filing a
24     very brief report telling the Court that the
25     depositions went forward smoothly and professionally

Page 80

1      and objections and instructions not to answer based on
2      privilege were few in number and they were ruled upon
3      without any significant controversy, that counsel were
4      appropriately respectful of the Special Master and
5      each other.
6         Does anybody have any further suggestions,
7      additions to that?
8         MR. MEEKS:  I don't, Mr. Schultz.  My only
9      thought was when I read the order, and you might take
10     a look and see what you think, I thought Judge Zloch
11     was contemplating one report at the end of all the
12     depositions, there's one left, which is Ms. Ward.  So
13     I don't know that you have to do it now.
14        SPECIAL MASTER SCHULTZ:  Oh, okay.  I
15     didn't realize it.
16        MR. MEEKS:  I don't know.  He wrote it, I
17     didn't write it.  We didn't submit a proposed order so
18     --
19        MR. MYCHALOWYCH:  I don't have an objection
20     either way.
21        SPECIAL MASTER SCHULTZ:  Yeah.
22        MR. MYCHALOWYCH:  I mean, even if it's
23     done, I don't know if the judge is looking for some
24     sort of interim report or -- I don't know.
25        SPECIAL MASTER SCHULTZ:  When is Ms. Ward

MEGHAN W. CASSIDY
December 6, 2007

Page 81

1   scheduled?
2          MR. MEEKS:  The 18th.
3          SPECIAL MASTER SCHULTZ:  Okay.  I'll wait.
4          MR. MEEKS:  Okay.
5          SPECIAL MASTER SCHULTZ:  Okay.
6          MR. MEEKS:  All right.  Thank you, Mr.
7   Schultz.
8          SPECIAL MASTER SCHULTZ:  We're done for the
9   day then, right?
10         MR. MEEKS:  Yes, sir.
11         THE WITNESS:  Thank you, Mr. Schultz.
12         MR. MYCHALOWYCH:  Thank you.
13         SPECIAL MASTER SCHULTZ:  And I appreciate
14  everybody's professional conduct.
15         MR. MYCHALOWYCH:  Thank you.
16         MR. MEEKS:  Thank you.
17         VIDEO TECHNICIAN:  The time is now 12:09
18  and 41 seconds p.m.  That concludes this deposition.
19  We're now off the record.
20         (The deposition was concluded at 12:09 p.m.
21      Signature of the witness was not requested by
22      counsel for the respective parties hereto.)
23
24
25

Page 82

1              CERTIFICATE OF NOTARY
2   STATE OF MICHIGAN    )
3                        ) SS
4   COUNTY OF MACOMB     )
5
6          I, Lezlie A. Setchell, a Notary Public in
7   and for the above county and state, do hereby certify
8   that the above deposition was taken before me at the
9   time and place hereinbefore set forth; that the
10  witness was by me first duly sworn to testify to the
11  truth, and nothing but the truth; that the foregoing
12  questions asked and answers made by the witness were
13  duly recorded by me stenographically and reduced to
14  computer transcription; that this is a true, full and
15  correct transcript of my stenographic notes so taken;
16  and that I am not related to, nor of counsel to either
17  party nor interested in the event of this cause.
18
19
20
21      _____
22          Lezlie A. Setchell, CSR-2404
23          Notary Public,
24          Macomb County, Michigan
25  My commission expires:  April 17, 2012

Page 83

1              INDEX TO EXAMINATIONS
2
3   Witness                          Page
4   MEGHAN W. CASSIDY
5
6   EXAMINATION
7   BY MR. MEEKS:                      4
8
9              INDEX TO EXHIBITS
10
11  Exhibit                          Page
12  (Exhibits not offered.)
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF NOTARY

STATE OF MICHIGAN  )

                   )  SS

COUNTY OF MACOMB   )


I, LEZLIE A. SETCHELL, a Notary Public in and for the above county and state, do hereby certify that the above deposition was taken before me at the time and place hereinbefore set forth; that the witness was by me first duly sworn to testify to the truth, and nothing but the truth; that the foregoing questions asked and answers made by the witness were duly recorded by me stenographically and reduced to computer transcription; that this is a true, full and correct transcript of my stenographic notes so taken; and that I am not related to, nor of counsel to either party nor interested in the event of this cause.


*Lezlie A. Setchell*

LEZLIE A. SETCHELL, CSR-2404

Notary Public,

Macomb County, Michigan


My Commission expires: April 17, 2012


BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888